**GRANT THORNTON LLP, Appellant,**

v.

**SUNTRUST BANK, Atlanta, as Trustee for Suntrust Retirement Sunbelt Equity Fund, and STI Classic Funds, for STI Classic Small Cap Growth Stock Fund, Appellees.**

**No. 05–03–00302–CV.**

Court of Appeals of Texas, Dallas.

April 29, 2004.

---

Robert W. Coleman, Joel E. Geary, Brown McCarroll, L.L.P., and Tracy Warren Berry, Brown McCarroll & Oaks Hartline, L.L.P., Dallas, for appellant.

Theodore Carl Anderson, Dorothy Elizabeth Masterson, Kilgore & Kilgore, P.L.L.C., John H. Crouch, W.D. Masterson, Kilgore & Kilgore, Inc., Dallas, Ira A. Schochet, Goodkind, Labaton, Rudoff & Sucharow, LLP, New York, NY, for Suntrust Bank.

Before Justices WHITTINGTON, JAMES, and O'NEILL.

## OPINION

Opinion by Justice JAMES.

This case involves a lawsuit against a public accounting firm, Grant Thornton LLP, for material misstatements and omissions of material facts in the registration statement for the initial public offering of Bollinger Industries, Inc. The trial court certified as a class action two of the causes of action brought by Suntrust Bank, Atlanta, (Suntrust) as Trustee for Suntrust Retirement Sunbelt Equity Fund (Sunbelt) and by STI Classic Funds for STI Classic Small Cap Growth Stock Fund (STI). Grant Thornton brings this interlocutory appeal of the trial court's amended order certifying a class. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(3) (Vernon Supp.2004). Grant Thornton raises three issues: (1) whether questions of law and fact common to the class predominate over individual questions, (2) whether a class action is superior to other available methods of adjudication, and (3) whether the claims of the named parties are typical of the class. We affirm the trial court's amended order granting class certification.

## FACTUAL BACKGROUND

Bollinger Industries, Inc. was a Delaware corporation with its headquarters in Texas. Bollinger sold sports equipment. The majority of Bollinger's sales were to mass-market retail companies, including Wal–Mart, K–Mart, Sears, and the television shopping channel QVC. In 1993, the company planned to go public, and it hired Grant Thornton to audit its books in preparation of the registration statement for its initial public offering. Grant Thornton audited the company's financial statements as of March 31, 1993 and issued a "clean" opinion on them. Grant Thornton assisted in the preparation of the registration statement and certified the accounting documents in the registration statement. In October 1993, before the initial public offering occurred, Grant Thornton learned that Bollinger's chief accounting officer and other executives had misrepresented to Grant Thornton that certain transac-

tions with QVC were "sales" when, in fact, they were only consignments, and that the supposed "sales" amounts were misrepresented as actual revenue even though QVC had the right to return any unsold items. Grant Thornton amended the registration statement to reflect lower expected earnings for 1993 and explained the change in "Footnote N" to the registration statement. Footnote N stated the misstatement in the earnings and in the classification of the QVC transactions was due to an "accounting error." The amended registration statement did not disclose that the misstatement in the earnings was due to the misrepresentations of the officers and executives of Bollinger or that Bollinger had only a consignment relationship with QVC.

Although the amendment corrected, at least in part, the misstatement of the QVC sales, plaintiffs alleged the registration statement continued to misrepresent that a transaction with Sears was a sale when it was actually a consignment, which resulted in the overstatement of earnings. Plaintiffs alleged the registration statement also failed to disclose that K–Mart had announced that all future transactions with Bollinger would be consignments. Plaintiffs asserted the registration statement also failed to disclose Bollinger's use of another company as a "pass-through" entity to Best Products, Bollinger's seventh-largest customer, which was in bankruptcy. Plaintiffs asserted the registration statement also failed to disclose Grant Thornton's lack of independence in that it was to be paid out of the proceeds of the initial public offering. Despite these alleged defects in the registration statement, the initial public offering occurred on November 17, 1993, and 1.4 million shares were sold.[1]

On March 22, 1995, Bollinger announced it would not meet its fourth-quarter projected earnings and that it had discovered fraud in one of its subsidiaries. Following these announcements, Bollinger's stock price dropped forty-three percent. Grant Thornton then learned of misrepresentations, lack of disclosure of material circumstances by Bollinger's executives, and fraudulent transactions that affected the 1994 and 1995 financial statements. After Bollinger's outside directors resigned in June 1995, Grant Thornton confronted Bollinger's management with the problems and insisted that Bollinger institute a new management structure. Bollinger refused, and on June 22, 1995, Grant Thornton resigned as Bollinger's auditor. On June 26, 1995, Bollinger announced the resignations of Grant Thornton and the outside directors, that it would not file its annual report with the Securities and Exchange Commission on time, and that it was in default with certain of its creditors. Following these announcements, Bollinger's stock fell seventy-one percent.

In March 1996, plaintiffs, who were or had been shareholders in Bollinger, sued Grant Thornton, the officers and executives of Bollinger, and the underwriters of the initial public offering asserting negligence, negligent misrepresentation, common-law fraud, and violations of the federal and state securities acts for misstatements in the registration statement.[2]

1. The sale of securities was registered with the United States Securities and Exchange Commission, but no evidence, pleading, or argument, either in the trial court or on appeal, shows whether the securities were also registered with the Texas Securities Commis-sioner or any other state's securities regulatory agency.

2. Plaintiffs also sued Bollinger and its directors, officers, and executives in federal court and in this lawsuit and have settled with them for $400,000 and 200,000 shares of Bol-

Plaintiffs requested the trial court certify them as representatives of a class of all shareholders deceived by the registration statement.[3] The trial court granted summary judgment for Grant Thornton on the negligence and negligent misrepresentation causes of action. In July 1999, after extensive briefing and a hearing on the class-certification issue, the trial court certified plaintiffs as class representatives, and Grant Thornton and the other defendants appealed. After the supreme court issued its opinion in *Southwestern Refining Co. v. Bernal*, 22 S.W.3d 425 (Tex.2000), which required that a class-certification order contain a trial plan, we reversed the class-certification order and remanded for further proceedings in compliance with *Bernal*. *Bollinger Indus., Inc. v. Suntrust Bank*, No. 05–99–01364–CV, 2001 WL 931159, at *4 (Tex.App.-Dallas Aug. 17, 2001, pet. dism'd w.o.j.) (not designated for publication).

Following our remand, the parties submitted additional briefing to the trial court on the class-certification issue. On February 13, 2003, the trial court certified the class for the state and federal securities act claims but denied class certification on the common-law and statutory fraud claims. Grant Thornton filed a notice of appeal. In its brief on appeal, Grant Thornton asserted (amongst other arguments) the class of plaintiffs for the federal securities act claim was too broad and the certification failed to address a choice of law issue. The plaintiffs moved the trial court to amend the class certification to overcome these two arguments. On July 14, 2003, after more briefing and another hearing, the trial court signed an amended class certification order further limiting the class of plaintiffs in the federal securities act claim and addressing the choice of law issue. Grant Thornton filed a notice of appeal from this amended order. We consolidated the two interlocutory class-certification appeals.

## CLASS ACTIONS

The prerequisites for class certification are set forth in rule 42(a) of the rules of civil procedure:

One or more members of a class may sue or be sued as representative parties on behalf of all only if:

(1) the class is so numerous that joinder of all members is impracticable,

(2) there are questions of law, or fact common to the class,

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and

(4) the representative parties will fairly and adequately protect the interests of the class.

Tex.R. Civ. P. 42(a). Once these prerequisites have been met, the trial court cannot certify the class unless it finds one of the conditions in rule 42(b) has been satisfied. In this case, the trial court applied rule 42(b)(4):

---

linger stock. Grant Thornton was not a party in the federal litigation. Also in this case, plaintiffs and the class sued and settled with the underwriters of the initial public offering for $1.5 million.

**3.** In 1998, Congress prohibited class actions under state common law or statutes (other than those of the state of incorporation) alleging, as in this case, "an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security." 15 U.S.C.A. § 77p(b)(1), (d)(1)(A) (West Supp. 2003). However, because this lawsuit was filed before November 3, 1998, the effective date of the statute, the prohibition against state-law class actions does not apply. Securities Litigation Uniform Standards Act of 1998, Pub.L. No. 105–353, § 101(c), 112 Stat. 3227, 3233 (1998).

the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include:

 (A) the interest of the members of the class in individually controlling the prosecution or defense of separate actions;

 (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

 (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;

 (D) the difficulties likely to be encountered in the management of a class action.

TEX.R. CIV. P. 42(b)(4).

 ■ On appeal, we determine whether a trial court abused its discretion in deciding whether to grant or deny class certification. *Kondos v. Lincoln Prop. Co.*, 110 S.W.3d 716, 720 (Tex.App.-Dallas 2003, no pet.); *see Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 690 (Tex.2002). A trial court abuses its discretion when it: (1) acts arbitrarily or unreasonably; (2) does not properly apply the law to the undisputed facts; or (3) rules on factual assertions not supported by the record. *Kondos*, 110 S.W.3d at 720. We examine the record to decide if the record shows actual (not merely presumed) compliance with rule 42. *Id.; see Bernal*, 22 S.W.3d at 435. Accordingly, we do not examine the evidence in the light most favorable to

the trial court's decision, nor do we entertain every presumption in favor of the trial court's decision. *Henry Schein, Inc.*, 102 S.W.3d at 691. We determine whether a trial court, before ruling on a class certification, has performed a rigorous analysis of whether all prerequisites to certification have been met. *Bernal*, 22 S.W.3d at 435; *Kondos*, 110 S.W.3d at 720. A trial court's grant of class certification without such analysis is an abuse of discretion. *Kondos*, 110 S.W.3d at 720; *see Bernal*, 22 S.W.3d at 435.

 ■ Texas Rule of Civil Procedure 42 is modeled on Federal Rule of Civil Procedure 23. "Thus, federal decisions and authorities interpreting current federal class action requirements [4] are persuasive in Texas actions." *Ford Motor Co. v. Sheldon*, 22 S.W.3d 444, 452 (Tex.2000) (footnote added).

### CHANGE IN CLASS

In its February 13, 2003 certification order, the trial court certified the class to consist of all persons who purchased shares of Bollinger common stock between November 17, 1993 (the date of the initial public offering) and June 26, 1995 (the date Grant Thornton's resignation as Bollinger's auditor was made public and Bollinger's stock price fell seventy-one percent). The class definition excluded all defendants in the case (i.e., all Bollinger insiders) and their affiliates, family members, representatives, heirs, etc. The class definition did not differentiate between claims under the federal and state securities acts.

---

4. The last relevant substantive amendment to the requirements for a class action set forth in federal rule 23(b) occurred in 1966. The 1987 amendment was nonsubstantive, and the 1998 amendment added a permissive interlocutory appeal from the grant or denial of class certification. Additional substantive amendments took effect December 1, 2003, but these amendments do not affect the requirements for a class action set out in federal rule 23(b).

Under section 11 of the federal securities act, an accountant who certified part of the registration statement may be sued by a purchaser of the securities if the registration statement contained an untrue statement of material fact or omitted to state a material fact. 15 U.S.C.A. § 77k(a)(4) (West 1997). The plaintiff does not have to prove reliance on the misrepresentation unless he purchased the securities at least one year after the corporation made earning statements generally available. *Id.* § 77k(b). In this case, Bollinger filed its first earning statement on February 14, 1994.

In its original brief on appeal, Grant Thornton argued that the requirement of a predominance of common issues was not met because, under section 11 of the federal securities act, class members purchasing shares at least one year after Bollinger made its earning statements generally available, February 14, 1995, would have to prove reliance on the misstatements and omissions in the registration statement, while those purchasing before February 14, 1995 would not have to prove reliance. After Grant Thornton filed its brief on appeal presenting this argument, appellees asked the trial court to amend its certification of the class to surmount this obstacle. Following more briefing and an additional hearing, the trial court amended the class on July 14, 2003 to distinguish between the state and federal securities act claims. Under the amended certification order, the class for the state securities act claim remained purchasers of Bollinger common stock between November 17, 1993 and June 26, 1995; but for the claim under section 11 of the federal securities act, the class was limited to purchasers of Bollinger common stock between November 17, 1993 and February 14, 1995. Under the amended certification order, no member of the class as now defined must prove reliance on the material misstatements and omissions to recover under the state and federal securities acts.

■ Grant Thornton argues the reduction of the federal securities act class affects the ability of the class representatives to represent the class adequately. The reduction of the federal securities act class leaves some class members with only state securities act claims. All of the class representatives have both federal and state securities act claims. Under the state securities act, the plaintiffs will have to prove Grant Thornton acted with intent to deceive or defraud or with reckless disregard for the truth or the law and that it materially aided Bollinger, which are facts that do not have to be proven under the federal securities act claim. *Compare* Tex. Rev.Civ. Stat. Ann. art. 581–33(F)(2) (Vernon Supp.2004) (liability of aider under Texas securities act) *with* 15 U.S.C.A. § 77k(a)(4) (West 1997) (accountant's liability under the federal securities act). Although neither of the class representatives is suing only for transactions occurring after February 14, 1995, STI purchased $21,563.75 worth of shares after February 14, 1995.[5] Under the trial court's order, these post-February 14, 1995 claims will be pursued only on the state securities act claims, which provide adequate incentive for the class representatives to pursue the state securities act claims. Grant Thornton's argument to the contrary lacks merit.

### RES JUDICATA

Grant Thornton asserts res judicata will bar all the class members from bringing independent suits for common-law and

---

**5.** On April 21, 1995, STI purchased 2654 shares of Bollinger for $21,563.75. This purchase constituted 3.33% of the 79,662 Bollinger shares STI purchased and 2.35% of its total investment of $916,299.50 in Bollinger stock.

statutory fraud and will bar the post-February 14, 1995 class members from bringing suits under the federal securities act. Grant Thornton argues that requiring the class members to give up such substantial rights in order to establish commonality demonstrates the inappropriateness of the class-action procedure in this case because the class action will not be superior to individual trials, the named plaintiffs will not provide adequate representation of the class, and the named plaintiffs' claims will not be typical of the class. Appellees argue res judicata will not bar the class members from bringing individual claims against Grant Thornton in other lawsuits on other causes of action and does not affect the trial court's findings on superiority, adequacy, and typicality.

 Res judicata precludes relitigation of claims that have been finally adjudicated or that arise out of the same subject matter and could have been litigated in the prior action. *Barr v. Resolution Trust Corp.*, 837 S.W.2d 627, 628 (Tex.1992). Res judicata requires proof of the following elements: (1) a prior final judgment on the merits by a court of competent jurisdiction; (2) identity of parties or those in privity with them; and (3) a second action based on the same claims as were raised or could have been raised in the first action. *Amstadt v. United States Brass Corp.*, 919 S.W.2d 644, 652 (Tex.1996). Texas follows the transactional approach to res judicata in determining what claims should have been brought, if they could have been, in a prior action. *Barr*, 837 S.W.2d at 630–31. Under the transactional approach, a judgment in a previous suit precludes a second action by the parties on matters actually litigated and causes of action arising out of the same subject matter that could have been litigated in the first suit. *Id.* at 630.

In a related issue, Grant Thornton, relying on *Henry Schein, Inc. v. Stromboe*, asserts the class action is inappropriate because the class action requires the class members to give up claims for damages they may have. In *Henry Schein, Inc.*, the plaintiffs brought a class action for defective software. *Henry Schein, Inc.*, 102 S.W.3d at 678. The plaintiffs sought both restitution for the amount they paid for the software and consequential damages from the failure of the defective software. *Id.* The supreme court concluded that the restitution damages would be common to the class but the consequential damages would require an individualized determination of each of the 20,000 class members' damages, which resulted in a lack of predominance of common issues. *Id.* at 694–95. The plaintiffs told the supreme court they were willing to forego their claims for consequential damages. In response the supreme court stated:

[I]t is not clear that a class action is superior ... if it necessitates that plaintiffs give up substantial rights, nor is it clear that the willingness of the five named plaintiffs to forego consequential damages is typical of the other 20,000 class members. The plaintiffs have failed to show how common issues predominate if consequential damages are to be proved, and *whether a class excluding consequential damages could or should be certified was not explored in the trial court.* Accordingly we cannot determine how they affect the question of certification.

*Id.* at 695 (emphasis added).

Thornton argues that, as in *Henry Schein, Inc.*, a class action is not superior because the class members are forfeiting claims for punitive damages they could receive under a successful fraud claim, and the post-February 14, 1995 investors are forfeiting any claims they might have un-

der the federal securities act. Additionally, Grant Thornton argues, all class members who purchased their shares outside Texas will forfeit whatever additional relief (if any) might be afforded them under their states' securities laws. In *Henry Schein, Inc.*, res judicata would bar the class members' claims for damages not obtained under the class's cause of action.

██ We conclude that we need not ascertain, before the fact, whether res judicata may bar the class members' potential causes of action for common-law and statutory fraud and federal securities act claims after February 14, 1995. This is because the answer to that issue is not outcome-determinative of the issue before us— whether the trial court properly certified the class. Here the trial court, unlike the trial court in *Henry Schein, Inc.*, specifically explored whether to certify a class excluding some of the claims held by the named plaintiffs and other prospective class members. Moreover, the trial court's Amended Class Certification Order and Trial Plan ordered the "Class Administrator" to provide notice by "registered and certified mail" to prospective class members who held claims that were being excluded from class status; the order specifically required the notice to include information regarding the right of any affected class member to opt out of the class. The same order also required the "Claims Administrator" to use his "best efforts" to contact affected class members by telephone to notify them of their right to opt out of the class.

Thus, unlike the record in *Henry Schein, Inc.*, the record here reflects that the trial court considered the adequacy of class representation issue in the context of claims splitting and authorized the class to proceed with safeguards designed to protect absent class members whose non-certified claims may be affected by the out-

come of the class action. The presence of these safeguards provides a basis, absent from *Henry Schein, Inc.*, for concluding that the class representatives would adequately represent any class members who decline to opt out of the class even if the res judicata effect of the judgment in the class action may bar them from asserting any claims not asserted in the class action.

We conclude that, in view of the record and the above provisions in the trial court's Amended Class Certification Order and Trial Plan, the doctrine of res judicata does not show the class action is inappropriate. Grant Thornton's argument to the contrary lacks merit.

## KNOWLEDGE

Grant Thornton also argues that the requirement of a predominance of common issues was not met because it has asserted the knowledge defense under the state and federal securities acts, which provide a defendant is not liable if the defendant proves the plaintiff knew of the material misstatement or omission when he purchased the shares. 15 U.S.C.A. § 77k(a) (West 1997); TEX.REV.CIV. STAT. ANN. art. 581–33(C)(2) (Vernon Supp.2004). Grant Thornton argues this determination will require a separate hearing for each class member to determine what the class member knew when purchasing the securities. The trial court rejected this argument because the plaintiffs asserted the alleged misstatements and material omissions were known only to insiders who are excluded from the class. The certification order addresses this issue as follows:

> Plaintiffs allege misrepresentations and material omissions that were known only to insiders who are excluded from the Class. Thus, this issue is, in the first instance, a common one involving whether the alleged misrepresented and omitted facts were generally accessible to or

otherwise knowable by members of the Class. If they were not, it is unlikely that, even in the event of further discovery of class members, this issue will present any burden at trial. On this issue of accessibility, after substantial merits discovery, the record is bare of any admissible evidence that would support this defense.

Thus, the trial court determined the knowledge defense was a common issue because the facts and circumstances of the case showed the class members did not have access to the information that would give them knowledge of the misrepresentations and omissions.

 Grant Thornton does not dispute the trial court's conclusion that after extensive discovery, "the record is bare of any admissible evidence" supporting the knowledge defense. However, Grant Thornton challenges the trial court's lack-of-access determination by asserting that any of the thousands of class members could have had a well-placed "friend" at Bollinger "or access to an Internet chatroom frequented by company insiders" and learned of the misstatements and omissions. This statement has no evidentiary basis and is nothing more than speculation. Grant Thornton produced no evidence to support its suggestion that any class member had a company-insider acquaintance who disclosed the misrepresentations and omissions. Grant Thornton's chat room suggestion involves at least three levels of speculation: (1) that any chat room frequented by company insiders existed; (2) that any insiders disclosed in those chat rooms that the company's registration statement contained material misrepresentations and omissions; and (3) that any class member had access to any such chat room. Grant Thornton produced no argument or evidence to support any of these three speculative areas. We will not con-

clude the trial court abused its discretion based on Grant Thornton's speculation. Grant Thornton cites no case where the mere speculative allegation that a shareholder in a class action under section 11 of the federal securities act might have knowledge of the misrepresentations and omissions in a registration statement defeats the predominance-of-common-issues requirement. If such speculation could defeat a class action, then there could never again be a class action under section 11 of the federal securities act. We are unwilling to adopt so radical a position. Furthermore, Grant Thornton's argument about talkative insiders and internet chat rooms was not raised before the trial court and, therefore, is not preserved on appeal. Tex.R.App. P. 33.1.

Grant Thornton also asserts that James Foster, Sunbelt's portfolio manager, testified in his deposition that he telephoned Bollinger's chief financial officer after the March 1995 stock drop and that, after this conversation, bought more shares of Bollinger. It appears Grant Thornton means to argue from this testimony that some institutional investors, like the named plaintiffs, could speak to Bollinger's executives who might have revealed the truth about the misrepresentations and omissions in the registration statement, which would raise individual issues relating to the knowledge defense. Although Foster testified that he could telephone Bollinger's president and/or chief financial officer, Foster also testified they "kn[ew] not to give us any unpublic [sic] information." Thus, Foster's testimony does not show he or Sunbelt had any more access to information about the misrepresentations and omissions than any other class member.

Grant Thornton also argues that, regardless of the evidence in the record and the facts and circumstances of this case, the knowledge defense is not a common

issue but necessarily requires an individual determination for each claimant, just as is necessary in determining reliance in a fraud case. Reliance on a misrepresentation or omission and knowledge of a misrepresentation or omission are not similar issues. Reliance is a thought process or one step in a larger thought process; knowledge is the possession of information. Reliance, or the lack thereof, can be shown only by demonstrating the person's thought processes in reaching the decision. Proof of reliance or lack of reliance necessarily requires an individualized determination because, under all the same facts and circumstances, one person may have relied on the misrepresentation in reaching a decision while another did not rely on it in reaching the same decision. Knowledge, the possession of information, requires that the person have access to the information, just as the possession of any tangible item requires the person have access to the item. Thus, unlike proof of reliance or the lack thereof, which necessarily requires an individual determination for each person, lack of knowledge can be proven for a group without individual determinations by showing the group had no access to the information.

In this case, the facts demonstrate that the information about the misrepresentations and omissions in the registration statement was of a type available only to insiders, such as Bollinger's officers and executives and the experts, like Grant Thornton, who assisted in the preparation of the registration statement. Indeed, the insider status of much of the information is shown by the fact that Grant Thornton had difficulty discovering the truth and allegedly was lied to by the officers and executives about the information. Other than

speculation about internet chat rooms and message boards, Grant Thornton does not explain how the misrepresentations and omissions in the registration statement, such as Bollinger's accounting practices and internal governance structures, could be known to anyone other than insiders.

Grant Thornton relies on an unpublished opinion from this Court, *Inland Royalty Co. v. Heruth,* No. 05–99–01684–CV, 2000 WL 792406 (Tex.App.-Dallas June 21, 2000, no pet.) (not designated for publication).[6] In that case, the defendant sent the plaintiffs, who were mineral interest royalty owners, letters offering to pay the plaintiffs for a one-year conveyance of their royalty interest. *Id.* at *1. The plaintiffs agreed, and they signed contracts enclosed with the letters. The contracts the plaintiffs signed, however, stated that the royalty conveyance was for one year and as long thereafter as production continued. *Id.* More than 600 plaintiffs signed the contracts, and they sought to bring a class action under the Texas securities act. *Id.* The trial court certified the class. On interlocutory appeal of the certification order, we held that common issues did not predominate because the issue of each class member's knowledge of the misrepresentation would require more than 600 mini-trials with different evidence and witnesses for each plaintiff. *Id.* at *2.

Grant Thornton argues that the class members' claims in this case "are no different than those in *Inland Royalty.* Because the trial court certified the class, each purchaser, in order to recover, will be required to independently testify at trial as to whether he had knowledge of any alleged misrepresentation or omission before he purchased Bollinger stock." We disagree. In *Inland Royalty,* the facts and

---

**6.** As an opinion not designated for publication, *Inland Royalty Co.* has no precedential value. Tex.R.App. P. 47.7.

circumstances of the case demonstrated that each class member had access to the information about the misrepresentation: the information was in the contract each class member signed. A class member in _Inland Royalty_ who read and understood the terms of the contract before signing it would have known of the misrepresentation and could not have recovered under the state securities act. In this case, the facts and circumstances do not show the class members had access to the information.

Grant Thornton also asserts, "The only relevant issue is whether the requirement that Grant be allowed to prove its knowledge defense through individual examinations of each class member defeats predominance. As this Court plainly stated in _Inland Royalty_, it does." Grant Thornton may be correct that the reasoning used in _Inland Royalty Co._ would lead to the conclusion that there is a lack of predominance of common issues _if_ Grant Thornton is allowed to conduct an individual examination of each class member. However, Grant Thornton must first demonstrate that it has the right to conduct an individual examination of each class member. The trial court has made no ruling on that issue, and it is not before us on this narrow, interlocutory appeal. _Cf. Kondos_, 110 S.W.3d at 721 (trial court abused discretion by certifying class in Telephone Consumer Protection Act case after deciding individual determinations would be required on whether each of 63,760 class members gave permission for defendant to send faxes). Whether Grant Thornton can examine each class member is a decision for the trial court on the basis of an appropriate motion from Grant Thornton. In _Inland Royalty_, the facts and circumstances of the case showed, "This issue [knowledge] is fact specific for each plaintiff and would require approximately 600 mini-trials with different witnesses and ev-

idence for each plaintiff." _Inland Royalty Co._, 2000 WL 792406, at *2. In this case, the facts and circumstances, as developed to this point in the litigation, show the issue of knowledge is not fact specific for each class member but that all class members are similarly situated because they did not have access to the information. Grant Thornton cites no authority showing, in this situation, it has a right as a matter of law to conduct individual examinations of each class member, and the record before this Court, unlike the record in _Inland Royalty Co._, does not show a need to conduct individual examinations of the class members to determine the knowledge issue.

Grant Thornton also relies on this Court's opinion in _Kondos v. Lincoln Property Co._ In that case, the plaintiffs brought a class action for unsolicited faxed advertisements. _Kondos_, 110 S.W.3d at 718. Under the Telephone Consumer Protection Act, a consumer cannot recover unless the advertisement was transmitted to the consumer without "prior express invitation or permission." 47 U.S.C.A. § 227(a)(4) (West 2001). The trial court found the issue of whether permission was given was an individual issue, but it certified the class anyway. _Kondos_, 110 S.W.3d at 721. We reversed, concluding the individual issue of permission by each of the 63,760 class members would predominate over all common issues because it would be the object of most of the litigants' efforts. _Id._ at 721–22. Unlike _Kondos_, however, the facts of this case do not show that the knowledge defense necessarily requires an individualized determination. In this case, the trial court concluded that knowledge of the misrepresentations and omissions was a class issue because the class did not have access to the information and, thus, Grant Thornton's knowledge defense will not re-

quire the individualized determination that was necessary with respect to the permission element of the plaintiffs' claims asserted in *Kondos*. *See BMG Direct Mktg., Inc. v. Peake*, No. 09–02–509CV, 2003 WL 1989413, at *2 (Tex.App.-Beaumont May 1, 2003, pet. granted) (mem. op.). We conclude *Kondos* is distinguishable.

Grant Thornton also argues the trial court's discussion in the certification order of the knowledge defense goes beyond the appropriate scope of a class certification decision by determining the merits of the knowledge defense. *See Intratex Gas Co. v. Beeson*, 22 S.W.3d 398, 404 (Tex.2000) ("Deciding the merits of the suit in order to determine the scope of the class or its maintainability as a class action is not appropriate."). We disagree. The trial court's discussion of the knowledge defense shows the trial court followed the supreme court's direction to go beyond the pleadings [7] and "understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Bernal*, 22 S.W.3d at 435 (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir.1996)). Nothing in the trial court's discussion of the knowledge defense constitutes a ruling on the merits of the defense or purports to limit Grant Thornton's right to pursue the defense under the applicable rules of procedure.

We conclude Grant Thornton has not shown the trial court abused its discretion

in certifying the class because of the knowledge defense. The record before us does not show the trial court was incorrect in concluding the knowledge defense presented issues common to the class members inasmuch as they all lacked access to information showing the misrepresentations and omissions. Of course, should subsequent developments show a lack of commonality among the class members on the knowledge defense, "the trial court possesses significant discretion to modify the class definition or even decertify the class as the case develops." *Intratex Gas Co.*, 22 S.W.3d at 405.

## CHOICE OF LAW

Grant Thornton asserts the trial court erred in determining that common legal issues predominate under plaintiffs' state securities act claim. Grant Thornton argues the Texas securities act does not apply to persons who are not Texas residents and who did not buy their shares from Texas brokers. Thus, Grant Thornton argues, the state securities laws of all fifty states will apply in this case depending upon where each class member purchased his shares. If the laws of all fifty states apply, then certification of this issue is not appropriate. *See Tracker Marine, L.P. v. Ogle*, 108 S.W.3d 349, 359 (Tex. App.-Houston [14th Dist.] 2003, no pet.).

▌ The trial court's determination of choice of law is reviewed de novo on appeal. *Busse v. Pac. Cattle Feeding*

---

7. The trial court's discussion in the class-certification order of the knowledge defense shows the trial court went beyond the pleadings. When the trial court signed the certification orders, Grant Thornton's live pleading did not allege the knowledge defense. However, in the motions, responses, and hearings on class certification, the parties and the trial court argued about and discussed the defense as if it had been pleaded. At oral argument before this Court, Grant Thornton was questioned about whether it had asserted the knowledge defense in its answer. Following oral argument, Grant Thornton filed an amended answer in the trial court asserting the knowledge defense, and it supplemented the appellate record to include the newly amended answer. Appellees have not indicated they have presented any opposition to the filing of the amended answer, nor have they asserted the amended answer cannot be considered on appeal.

*Fund No. 1, Ltd.,* 896 S.W.2d 807, 813 (Tex.App.-Tyler 1995, writ denied). At trial, the issue is one of law for the trial court. *Torrington Co. v. Stutzman,* 46 S.W.3d 829, 848 (Tex.2000); *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 421 (Tex.1984). In determining choice-of-law issues, Texas courts apply the most-significant-relationship test as set out in the Restatement (Second) of Conflict of Laws. The general test is set out in section 6 of the Restatement. However, the Restatement contains sections for specific situations, ànd when these are applicable, the courts are to apply them to resolve the conflict. *See Hughes Wood Prods., Inc. v. Wagner,* 18 S.W.3d 202, 205 (Tex.2000); *Tracker Marine, L.P.,* 108 S.W.3d at 355.

In the amended class-certification order, the trial court ruled that Texas law should be applied to the claims of all class members regardless of their residence or where they purchased the shares because:

> all of the alleged misrepresentations or omissions flowed from an audit and related work that occurred in Texas with respect to a Texas based corporation. The Court further notes that because the Texas-based corporation was the client of the auditing firm and Texas has a substantial interest in applying its law relating to a professional client relationship centered in Texas, Texas has the most significant relationship to all of the claims or all class members that derive from that relationship, that all other contacts with other states are relatively insignificant, and, thus, the law of Texas should apply to all of the state securities act claims.

■■■■■ Grant Thornton appears to concede that Texas law applies to Texas residents who purchased shares in Texas. However, Grant Thornton asserts Texas law, including the Texas securities act, does not apply to any non-Texan class members who did not purchase their shares in Texas. When the claim on which there is a conflict of laws is based on fraud and misrepresentations, and the plaintiff's actions in reliance took place in a different state from the one in which misrepresentations were made, the courts consider the following factors in determining which state has the most significant relationship to the occurrence and the parties:

(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

(b) the place where the plaintiff received the representations,

(c) the place where the defendant made the representations,

(d) the domicil, residence, nationality, place of incorporation and place of business of the parties,

(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

(f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 148(2) (1971); *see Tracker Marine, L.P.,* 108 S.W.3d at 355–56. "If any two of the above-mentioned contacts, apart from the defendant's domicil, state of incorporation or place of business, are located wholly in a single state, this will usually be the state of the applicable law with respect to most issues." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 148 cmt. j (1971); *see Tracker Marine, L.P.,* 108 S.W.3d at 356.

Applying these factors to this case shows the following: (a) any reliance by the plaintiffs would have occurred in the states where they purchased their shares (this factor supports Grant Thornton); (b)

the plaintiffs received the representations in the place where they saw the prospectus, presumably their home states (this factor supports Grant Thornton); (c) the representations were made from Texas (this factor supports appellees); (d) Bollinger is a Delaware corporation headquartered in Texas; Grant Thornton is a firm of independent public accountants, the record does not show where it is headquartered, but it performed the audit in Texas; Suntrust is a national bank with its headquarters in Georgia, and STI is a mutual fund set up by Suntrust; and the class members are residents in the fifty states (this factor is neutral); (e) this case involves only intangibles (this factor is neutral); and (f) there does not appear to be a contract to be performed (this factor is neutral). Analysis of these factors shows appellees and many of the class members received the prospectus and purchased their shares outside Texas, but this factor is equally balanced by the fact that Grant Thornton performed the audit in Texas of a Texas corporation that made the alleged misrepresentations and omissions from Texas. We conclude application of section 148 does not resolve the issue.[8]

Because the specific Restatement provision has failed to resolve the conflict, we apply the general provisions of section 6. When there is no legislative directive, the general test involves analysis of several factors, as follows:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(2) (1971); *see Torrington Co.*, 46 S.W.3d at 848. Although several cases have addressed the issue of choice of law in the context of the Texas securities act, none has done so applying the factors in Restatement section 6 to article 581–33(F)(2). *See In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F.Supp.2d 549, 691–92 (S.D.Tex.2002) (applying Texas securities act without applying the Restatement; "Texas statute is ... intended not only to protect Texas residents but also 'non-Texas residents from fraudulent securities practices emanating from Texas.'" (quoting *Baron v. Strassner*, 7 F.Supp.2d 871, 875 (S.D.Tex.1998))); *Weatherly v. Deloitte & Touche*, 905 S.W.2d 642, 650 (Tex.App.-Houston [14th

---

8. Applying the similar factors for tort claims under Restatement section 145 yields the same result. The factors under section 145 are: (a) the place where the injury occurred (here, wherever the plaintiffs reside); (b) the place where the conduct causing the injury occurred (Texas, where Grant Thornton conducted the audit and the registration statement was prepared); (c) the domicil, residence, nationality, place of incorporation and place of business of the parties (all fifty states); and (d) the place where the relationship between the parties is centered (Texas,

where the Bollinger company is headquartered). RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(2) (1971). Like the analysis under section 148(2), analysis of these factors shows an equal balance between Texas and the laws of the different states because appellees and many of the class members received the prospectus and purchased their shares outside Texas and Grant Thornton performed the audit in Texas of a Texas corporation that made the alleged misrepresentations and omissions from Texas.

Dist.] 1995, writ dism'd w.o.j.) (choice of law issue not determinable at class-certification phase of litigation and not properly presented in trial court), *mandamus denied*, 951 S.W.2d 394 (Tex.1997); *Lutheran Bhd. v. Kidder Peabody & Co.*, 829 S.W.2d 300, 309–10 (Tex.App.-Texarkana 1992) (setting out the factors under Restatement sections 6, 145, and 148 but not applying them individually), *writ granted w.r.m.*, 840 S.W.2d 384 (Tex.1992).[9]

■ The first factor, "the needs of the interstate and international systems," as applied to plaintiffs' case against Grant Thornton, misrepresentations and omissions in an initial public offering registration statement, is obvious: to guarantee the provision of truthful and complete information necessary for potential investors to determine the risks and benefits of investing in the company. The state of the corporation's location (together with the federal securities regulation system) has the greatest opportunity and incentive to regulate the corporation and the experts it hires, such as Grant Thornton, to meet the needs of the interstate and international systems. Accordingly, this factor favors application of Texas law.

The second factor, "the relevant policies of the state of the forum," is set out in article 581–10–1: "This Act may be construed and implemented to effectuate its general purposes to protect investors and consistent with that purpose, to encourage capital formation, job formation, and free and competitive securities markets and to minimize regulatory burdens on issuers and persons subject to this Act, especially small businesses." TEX.REV.CIV. STAT. ANN. art. 581–10–1(B) (Vernon Supp.2004). The legislature's statement of the general purpose "to protect investors" is not limited to Texans and those purchasing securities in Texas. This factor also favors application of Texas law.

The third factor, "the relevant policies of other interested states and their relative interests in determining this issue," varies widely from state to state.[10] Many states, either by statute or case law, do not permit this sort of action against an accounting firm. Some states that may permit a cause of action against an accountant for aiding and abetting require the plaintiff to prove reliance on the misstatement or omission. Most of the states have shorter limitations periods than Texas. Review of the statutes shows that almost none of the states are as interested in providing a remedy for the alleged fraud in this case as Texas is in providing a remedy for the shareholders of Texas-headquartered companies. This factor also favors application of Texas law.

The fourth factor is "the protection of justified expectations." Investors from

**9.** *Lutheran Brotherhood* involved a suit against a seller of corporate bonds. Nothing in the opinion indicates that the corporation issuing the bonds had any connection with Texas. All the solicitations were made from the defendant's New York or Minnesota offices to the plaintiffs' offices in New York and Texas. *Lutheran Bhd.*, 829 S.W.2d at 304. The court of appeals held the plaintiffs who received the solicitations to purchase at their Texas offices could bring suit under Texas law, but those who received the solicitations at their New York offices could bring suit under New York law, but not Texas law because there was no "significant contact or aggregation of contacts to the claims asserted." *Id.* at 310. In this case, the asserted claims have significant contacts with Texas because they are based on misrepresentations about a Texas-based corporation and an audit performed in Texas. Thus, *Lutheran Brotherhood* is distinguishable from the case before us.

**10.** Grant Thornton included in the appendix to its brief a chart showing the position of all fifty states to this type of lawsuit, as reflected in both statutes and case law.

other states purchasing shares in a company headquartered in Texas would be justified in expecting they could rely upon Texas laws. However, those same investors would also be justified in expecting they could rely upon the securities laws of the states where they purchased their shares. This factor is neutral.

The fifth factor, "the basic policies underlying the particular field of law," is the protection of the investor from fraudulent misrepresentations and omissions in registration statements. Both Texas and the other states have an interest in supporting this policy. "In such instances, there is good reason for the court to apply the local law of that state which will best achieve the basic policy...." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 cmt. h (1971). As discussed above, the Texas aiding and abetting statute, with its long limitations period and lack of a reliance element, is one of the most supportive of investor protection. Accordingly, this factor supports applying Texas law.

The sixth factor, "certainty, predictability and uniformity of result," is best served by allowing all investors in Texas-based companies to enjoy the protections provided by the Texas securities laws. This factor favors application of Texas law.

The final factor, "ease in the determination and application of the law to be applied," is concerned with the ideal of choice-of-law rules being "simple and easy to apply." *Id.* cmt. j. Having the laws of the headquarter state be applicable is both simple and easy to apply. This factor also supports the application of Texas law.

If we accepted Grant Thornton's argument that the Texas securities laws applied only to the class members who were

Texas residents or bought their shares in Texas and all other class members must look to the laws of their states for relief, then the result would be the unnamed class members would bring their states' securities law claims against Grant Thornton in separate suits or in fifty different class actions in Texas courts. This result would not provide "ease in the determination and application of the law to be applied."

After considering all the factors under section 6 of the Restatement, we conclude that Texas—as the state where the headquarters of Bollinger are located, the state where Grant Thornton performed the audit at issue, the state where the registration statement with the alleged misrepresentations and omissions at issue was prepared, and the state of residence of some of the class members—is the state with the most significant relationship to the litigation. As the Restatement notes, "it is fitting that the state whose interests are most deeply affected should have its local law applied." *Id.* cmt. f. In this case, Texas is "the state whose interests are most deeply affected." Accordingly, we conclude the trial court did not err in determining that Texas law applies to all class members.[11] *Cf. Baron,* 7 F.Supp.2d at 875–76 (defendants failed to establish that Texas law could not apply to claims of nationwide class suing under article 581–33 for misrepresentation of financial condition of Texas-based company preceding initial public offering of company's stock).

## VALUE OF THE INDIVIDUAL CLAIMS

Grant Thornton argues the class action is not superior to individual suits as the

---

11. We do not hold that Texas law applies to the *exclusion* of all other states' laws. The class members who did not purchase their shares in Texas may have claims under the laws of the states where they purchased their shares. However, that issue is not before us, and we make no resolution of that issue.

method of resolving the dispute because the class-members' claims would not be "negative value" suits. A negative-value suit is one in which the stakes to each member are too slight to repay the cost of suit. *Bernal*, 22 S.W.3d at 439. In *Henry Schein, Inc.*, the supreme court stated the potential of each class member to recover $5000 to $10,000 plus attorney's fees was sufficient incentive for each class member to bring an individual suit. *Henry Schein, Inc.*, 102 S.W.3d at 699–700. Grant Thornton asserts the evidence shows the potential recovery of about forty percent of the class members is at least $5000 plus attorney's fees.[12]

■ In support of this argument, Grant Thornton relies on the affidavit of Brian Burke, a Senior Project Manager with The Garden City Group, Inc., the company that administered the class claims of the settlements with the underwriters and the other Bollinger defendants. In processing these settlements, Garden City Group received a total of 311 potentially payable claims. Burke stated in his affidavit: "The median loss for the 311 claims is $2,868.75. There are 157 claims that have a loss smaller then [sic] the median. There are 80 claims with a loss below $1,000 and 192 claims with a loss below $5,000." Thus, 119 of the claims, or 38.26% of the 311 claims, were for $5000 or more. However, Burke does not state what the remaining amount of these claims is following the settlements with the underwriters for $1.5 million and with the other Bollinger defendants for $400,000 and 200,000 shares of Bollinger stock. These settlements may take many of the originally large claims into the negative-value range.

We conclude Grant Thornton has failed to show the trial court abused its discretion in determining that a class action is superior to individual suits because of the value of the individual claims.

## THE REPRESENTATIVE PARTIES

Grant Thornton argues the class certification in this case was inappropriate because the claims of the representative parties, appellees, are not typical of the remainder of the class. Specifically, Grant Thornton argues Suntrust as trustee for Sunbelt, lacks standing as a plaintiff because Sunbelt no longer exists under Georgia law and it no longer owned any shares at the time of the precipitous price drops in March and June 1995 and thus had no damages. Grant Thornton argues STI is not typical of the class members because its claims are barred by limitations.

■ Appellees argue this Court ruled on both these issues in our 2001 opinion and that they are subject to the law of the case doctrine. We disagree. "The law of the case" is a doctrine mandating that the ruling of an appellate court on a question of law raised on appeal will be regarded as the law of the case in all subsequent proceedings of the same case. *See Hudson v. Wakefield*, 711 S.W.2d 628, 630 (Tex.1986); *Aycock v. State*, 863 S.W.2d 183, 187 (Tex.App.-Houston [14th Dist.] 1993, writ ref'd). Matters of law that were disposed of on a former appeal will not again be decided by the court. *Aycock*, 863 S.W.2d at 187. A reviewing court does not again pass upon any matter either presented to or directly passed upon or that was, in effect, disposed of on a former appeal to that court. *J.O. Lockridge Gen. Contractors, Inc. v. Morgan*,

---

12. Under both the federal and state securities acts, the decision whether to award attorney's fees is in the discretion of the trial court. 15 U.S.C.A. § 77k(e) (West 1997); TEX.REV.CIV. STAT. ANN. art. 581–33(d)(7) (Vernon Supp. 2004).

848 S.W.2d 248, 250 (Tex.App.-Dallas 1993, writ denied). In the earlier appeal, the appellants argued Suntrust's lack of standing deprived the trial court of jurisdiction, and it argued the merits of its limitations defense against STI. *Bollinger Indus., Inc.,* 2001 WL 931159, at \*2–3. We held that Suntrust's alleged lack of standing did not deprive the trial court of jurisdiction because it was undisputed that STI had standing, which was sufficient to vest the trial court with subject matter jurisdiction over the cause. *Id.* at \*3. We also held that review of the merits of the appellants' limitations defense was inappropriate on the appeal of a class-certification order because, "In an interlocutory appeal from a certification order, we may not determine the validity of defenses asserted against the class...." *Id.* We observed, "In this issue, appellants do not assert their limitations defense destroys the commonality or typicality requirements of class actions...." *Id.* As our earlier opinion shows, we did not rule on Grant Thornton's arguments that are now before us, whether the lack-of-standing and limitations allegations prevent appellees from meeting the typicality requirement for a class action. Accordingly, determination of these issues is not controlled by the doctrine of the law of the case.

The existence of a defense against a named party that may not exist against the rest of the class does not necessarily destroy typicality. *See Citizens Ins. Co. of Am. v. Hakim Daccach,* 105 S.W.3d 712, 726 (Tex.App.-Austin 2003, pet. filed). As the Texarkana Court of Appeals observed,

> The presence of "an arguable defense unique to the named plaintiff" properly negates typicality only when "it is predictable" that such defense will become

a "major focus of the litigation," *Koos v. First Nat'l Bank,* 496 F.2d 1162, 1164 (7th Cir.1974), such that the named plaintiff "will become distracted by the presence of a possible defense ... that the representation of the rest of the class will suffer," *J.H. Cohn & Co. v. Am. Appraisal Assocs., Inc.,* 628 F.2d 994, 999 (7th Cir.1980).

*Bailey v. Kemper Cas. Ins. Co.,* 83 S.W.3d 840, 854 (Tex.App.-Texarkana 2002, pet. dism'd w.o.j.). In this case, neither the issue of standing nor limitations appears to involve disputed facts. Whether Sunbelt exists is a question of law to be decided by application of Georgia law, and its standing due to lack of damages is similarly merely a question of law. The issue of whether STI's claims are barred by limitations also appears to involve only the application of law to established facts. Although these legal issues may be complex, they are unlikely to become the focus of the litigation given the apparent existence of numerous fact issues[13] to be determined in a jury trial or before the court as trier of fact. We conclude Grant Thornton has not shown the trial court's determination that appellees' claims are typical of the class was an abuse of discretion.

## CONCLUSION

After reviewing the record, we conclude the trial court performed a rigorous analysis of whether all prerequisites to certification have been met. We hold the trial court's certification of this class action was not an abuse of discretion.

We affirm the trial court's amended order certifying the class.

---

**13.** Whether any questions involve a genuine issue of material fact or whether any evidence supports any element of the parties' claims

and defenses is not before us, and we make no holding on those issues.